Go ahead. Thank you. May it please the Court, my name is Craig Bailey, and I represent the appellant, Contemporary Services Corporation. I would like to reserve two minutes for rebuttal with the Court's permission. This case seeks to hold the landmark defendants accountable for their role in the misappropriation of CSC's trade secrets. We are seeking to have the District Court's grant of summary judgment in favor of these defendants reversed, and the case remanded for further proceedings because the District Court committed errors of law that prevented CSC from presenting genuine, triable issues to the jury. As the Court probably knows, the standard of review here is de novo, the evidence being reviewed in the light most favorable to the appellant, CSC. CSC, by way of background, is the industry leader in crowd control and security for sporting events and concerts. If you've ever watched a USC football, UCLA football, Rams football game on television and seen those folks positioned around the stadium with the yellow jackets that say Event Staff on the back, that is Contemporary Services Corporation. That is what they do. What do they do? Excuse me? What do they do? It's crowd control. Crowd control. Crowd control and event security is what they provide. And their role begins before the event, as people are coming in, during the event, and after event. It's a rather large undertaking. For an event like a typical Rose Bowl football game, where you might have 70,000 to 80,000 spectators in attendance, CSC will deploy 1,000, 1,500, perhaps more people for crowd control. They let them drink alcohol in those football games. Yes. They didn't do it when I was. It's been around. CSC has been in this business for some 40 years at this point. Landmark, at the time relevant to this case, was a startup company formed by two former CSC executives, Peter Kransky and Michael Harrison, who had worked for CSC for many years. Almost from the inception of Landmark's operations, they seemed to have possession of all of the operational documents you would need to bid for these kind of jobs and to perform these kind of jobs. And as discovery in this case demonstrated, they got there because they were using materials that Grant Haskell had stolen from CSC before he. Where did the district court go wrong? The district court went wrong in several respects. First of all, I want to focus on Landmark's acquisition and use of the CSC materials after Mr. Haskell's theft. I know our briefs have separately addressed the question of whether Landmark was involved in that initial theft. I'll rely on our briefs for that point. But for the later acquisition and use, which is a separate grounds for liability under the California Uniform Trade Secrets Act, there really was no question in this case that they had acquired and used the CSC material Landmark, or excuse me, Mr. Haskell had stolen. The real debate was the mental element. Did they know or should have known? Did they know or have reason to know that they were using material that had been acquired improperly from CSC? The district court said there was no factual dispute over that. Well, there was plenty of factual dispute, but more to Your Honor's first question, where did the district court go wrong? The district court applied the wrong legal test here. The district court only looked at the question of whether the Landmark defendants had actual knowledge, never considered the second part, that had reason to know, which is expressly provided for in the statute, and had the district court considered the had reason to know aspect, they would have seen the evidence that we introduced that would have given Landmark inquiry notice. The documents that the Landmark defendants were using were obvious copies of the CSC originals. Typos at all were transposed. Anyone familiar with the CSC materials, as Kransky and Harrison certainly were from their many years with the company, would have immediately seen the similarity in the documents. The documents also contained metadata, which had the Landmark defendants looked, would have pointed to CSC as having been the origin of these documents. Some of the metadata showed that documents that Landmark was using, the metadata showed that the original document was created in 2004. That was two years before Landmark ever came into existence. But the Landmark defendants never looked into that, and the district court did not even consider the inquiry notice evidence. But in addition, I think the district court also erred by making an improper fact finding on the question of even actual knowledge, because we did have evidence here of actual knowledge on the part of the Landmark defendants. First and foremost, Mr. Haskell was sued by CSC and accused of stealing the very trade secrets that are at issue in this case. That's the Washington action that's discussed in our brief. How much more knowledge do you need that something was awry here than the fact that your employee had been sued for this? I thought this fellow at Landmark, I forget what his name is, had required Haskell to sign statements that he didn't take any, that he wasn't bringing anything with him. He did. But at the time those statements were signed, they were false and Landmark knew they were false. Haskell downloaded mass quantities of material the day he left, maybe it was two days before he left CSC. The forensic evidence proved that unmistakably. How did Landmark know that they were false, or what evidence shows that they were false? That Haskell's statement was false. Yes, because in some early communications that took place between Haskell and Kransky and Harrison, Mr. Haskell just volunteered that a question came up about a particular type of document, and Mr. Haskell just volunteered, well I have one that I saved from CSC. So they knew he had kept material from CSC. And certainly after he starts working with Landmark, within the first month he's assigned the task of creating training materials for Landmark, and he suddenly starts emailing Kransky and Harrison copies of training materials that he supposedly created that look remarkably like the CSC originals. Again, typos and all. So certainly there was notice at that point that there was something awry here with Haskell, and Landmark did nothing. Can I back you up just a bit? Yes. So the district court found that, or concluded that on the record, the record evidence that the only item that you point to as qualifying as a customer information? That is the one item that the district court ruled in our favor on. Yes. That's the only item. Correct. All the others she said don't meet the test. That's what her ruling was, yes. Do you? Well certainly, and I think. What was wrong with that ruling? Okay. Let me focus on the one trade secret that I think is the one that's most important in this case, and that's the workbook, the deployment workbook. And it might be helpful for me just to explain a little bit to the court about what this workbook is. As I've said, staffing one of these events is like deploying a small army in battle. You've got 1,000 to 2,000 people out there. You need to know where they are, who they are. You need to respond quickly to ever-changing conditions. You know, a fight breaks out in the parking lot, and suddenly you need to deal with that. That's what this deployment workbook does. It allows the event manager to have at his fingertips all the information he needs to make those decisions. It tells him who his people are, where they are, and if an emergency comes up he can decide where to take the people from, make sure they have the right credentials for the new assignment, decide where he needs to put them, and once that redeployment takes place, everything is updated so that now he has it at his fingertips. So this is an electronic deployment workbook? Yes, it is. Because what Landmark stole is the electronic file that drives the functionality for the workbook. They didn't steal paper printouts. It was the electronic file. And that electronic file was something that was kept secret by CSC, used only by its managers to run the events. Significantly, there was nothing else like this in the industry. The competitors at that time were using manual forms to manage their deployments, which certainly didn't have this instantaneous capability that the CSC deployment workbook had. And the reason the district court disqualified the workbook as a matter of law is because she relied on the readily ascertainable standard, which has been discredited under California law. She found, as a factual matter, that others in the industry could easily have created the workbook. First of all, that was a disputed question of fact. There was a lot of evidence to the contrary. It took CSC years to do this. Our expert described it as a sophisticated document that would take significant time and energy to create. There was nothing else like it in the industry. If it was so easy, why didn't other people have this? So it was a fact finding that was just not proper for summary judgment. But beyond that, the California courts, and I would draw your attention to the ABBA rubber case, explained quite clearly that when the Uniform Trade Secrets Act was adopted in California, California decided to delete the readily ascertainable standard. The Uniform Act had that in and would allow someone to disqualify something as a trade secret if the trier of fact was to determine that it was readily ascertainable. And the California legislature, as explained by the ABB rubber case, decided that that just muddies the waters. It makes it unclear what trade secrets are and leads to rampant speculation about how easy or hard it would be to do something, which is exactly what happened in the district court here. So that language was taken out of the statute and is not part of the inquiry under California law as to whether something qualifies as a trade secret. So the district court erred as a matter of law. There was another significant item. It was called the library. What was it called? The library, yes. The library, which was a compilation of a number of different documents. The district court said most of that stuff is just available. You can get it any place. There's nothing protected about it. Nothing unique or nothing. First of all, the district court missed the vast majority of the library. She only focused on one little part of it, which was the training materials, and she made her finding that that material was like the self-directed case. It was like a training class you give to the public. What the library really was was much more than that. It was all of the ‑‑ it's the cookbook for how CSC was running its business. That information was not publicly available, and I would like to emphasize, because I think this is a point the district court didn't fully appreciate, is that our position was that the library was protectable as a trade secret compilation. We could have made a case that individual parts were individually protectable, but that wasn't the case we presented below. We were relying on a compilation theory, and under that law, the fact that parts are in the public domain does not disqualify something from being a trade secret compilation. That's the whole idea. A compilation is a collection of material, parts of which could already be in the public domain. I would direct the court's attention to cases like the Pyro Spectacular's case that we cited in our brief and the Bunker case that we cited in our brief. I believe our library was much more analogous to those than the self-directed case that the district court relied upon. You're almost out of time. I'll give you some time for rebuttal. Okay. I have a minute left, so I'll conclude. Thank you. Good morning, Your Honors. I'm Mel L'Avenzato of the L'Avenzato Law Firm, and I represent Landmark, Peter Kransky, and Michael Harrison through this odyssey of litigation that we have endured. I'm going to divide my argument into three parts. The first, which you didn't hear from the appellant's counsel, is relating to the requirement that a trade secrets plaintiff identify with particularity, sufficient particularity, the trade secrets on which claims were misappropriated. So was there ever a domain? That seems to be a unique requirement in California law. Well, no, Your Honor. Before discovery begins. Yes. They cite to the discovery provision. There's nothing in California law that says they have to allege in the complaint the trade secret with particularity. Correct. But in federal cases like the IMAX case of this circuit and the MAI systems case, the requirement is not tied to the discovery statute in California. No, it just says before discovery commences. Well, that's the procedure under California law. Correct. We did not avail ourselves of that because under federal rules, of course, Rule 26 requires you to disclose the baseness of your claims. So you didn't really raise this point until summary judgment. No, we did. Before summary judgment? Of course. They did not allege they did not. Did you file a motion to compel further, you know, like. Yes. Compel them to identify specifically. You know, like I read some of the California cases, and sometimes you read cases about how there was a motion to compel identification with particularity, the particular trade secrets are in dispute. Docket 126 is Magistrate Judge Nakazato's order ordering them to supplement interrogatory responses and identify all of the trade secrets upon which they were making their claims. So we did move to compel after the remand from the Ninth Circuit. And what the responses are all in the record with respect to the supplemental responses, their list of documents that they submitted, and that's where they hedged, where they say, well, they're not all trade secrets, they're just the basis of our claims. And I think one of the reasons why they focus on the alleged misappropriation is they cannot identify any trade secrets within this stack of documents that they produced. Now, they identified in response to the order, Docket 126, 642 pages, I believe, of documents. Those we designated as CSC California 1 through 22. That's Exhibit C to Elaine Yu's declaration in some regard. They, after the discovery, or closely at the discovery cutoff, they produced another stack of 225 pages, which were exhibits to their expert's declaration, or report, sorry. And that was 225 pages. So there's 867 pages of stuff that they produced in the case below. We submitted all of that in our summary judgment papers. Prior to that time and during their opposition, they did not identify what of those documents are trade secrets. They just used their general nomenclature that Mr. Bailey repeats again, the cookbook, the recipe of success, for success. They don't identify the ingredients for the recipe of success, but they say, well, here's the 867 pages that we gave to you, and this is our trade secrets. Well, under IMAX, MAI systems, and all the cases we cited in our brief under federal law, that's insufficient to assert a trade secret claim before a district court. And on reply, on the reply brief before this court, they suggest that Judge O'Connell didn't rule on that basis, but she did. And that appears, even though they say that it didn't, it wasn't a basis of her opinion, there's an entire section of that opinion that's entitled, CSE failed to identify its alleged trade secrets with sufficient particularity. So that is the principle, at least the first basis of her decision. That's number one. Let's assume that's not a hurdle for them. That would disappoint me, Your Honor. Let's just assume that it's not a hurdle. Well, then there's her analysis of what constitutes a trade secret. So before they can get to misappropriation, then they have to identify what the trade secrets are. And in California, it relates to whether or not the matters, the information, derives independent economic value from being unknown to the public, right? So when Mr. Bailey talks about the readily ascertainable test, we're talking about semantics. Because what they have to prove as a plaintiff is that the information is not, or is valuable because it is not known. And the test includes general knowledge of the public or specialized knowledge of people skilled in the trade. Now, the factual background that Mr. Bailey enunciated kind of neglects certain things. Pete Kransky was the co-founder of CSE. And he was the one who led CSE's operations for the bulk of that time. That's well established in the record from CSE's own current vice presidents and other officers. So all of the library and all of the cookbook was at least overseen by Pete Kransky. So I will tell you that obviously I disagree only with the finding that CSE 17 and 18 are potentially trade secrets. That's the customer information. Correct. But it is not really customer information. If you look at the documents themselves, they are invoices and a receivables ledger. So when you talk about the customer information that has been held before by other courts to be potentially trade secrets, you're talking about lists of customers, who to call, what their budgets were, et cetera. This is not that kind of information. This is just a QuickBooks ledger for payables, or receivables, sorry, and a, I lost my thought now. Well, it would identify who their customers were. Yes, but so does their website. So I mean, and so does the fact that, like he said, if you go to a Rams game, you'll see that they're staffing it. The customers here are not private. They're not hidden, like in other cases where you may be the lawyer for someone or you may be the computer technician for someone. This is not a situation where your clients are private. Now, with respect to the workbook, again, this is one of those things. Mr. Bailey did not, some of his statements were not supported by the record. For example, there's no evidence at all that at the event it immediately updates and somehow it gets sent to everybody in some sort of electronic gizmo. It is an accounting document that shows you how many people are working at what stations and for what price. This is in the deposition of one of their vice presidents that we cited in our papers below that talk about how while it is an Excel spreadsheet, and that's all it is, it's an Excel spreadsheet, it is only one that contains formulas of math and multiplication. How many people work at this venue or this gate versus how much the rates are and how much the invoices are going to be. So the efficiency part of that workbook has nothing to do with, and there's no evidence in the record of having to do with the fact that they can respond to fights and other incidents at an event. It has to do only with the accounting issues when they bill the client for how much the staffing is. But be that as it may. It seems like a pretty useful tool and a helpful tool. Exactly. It's exactly what it is, a useful tool of efficiency. And how it's put together and how it's compiled and the data that goes in and whatnot, I mean, that wouldn't be readily known to anybody. It's readily known to people with special skills in the industry. Of course it is. Mr. Kransky knows it, knows how to do it. It's an Excel spreadsheet created by someone with no training. There's a lot in this record that goes back and forth, and I've been accused of misciting things, and I've obviously said that some of their evidence is not in the record. Obviously it's a mountain of work for a court to decipher that. But let me talk about two things in the record that illustrate my point. He claims, Mr. Bailey in his brief claims, that I misapplied the objection that was sustained by the district court relating to testimony outside a witness's personal knowledge. And he says it was limited only to Damon Zumwalt's testimony about the NFL. That is not the case. If you look at the ruling, it talks about how they submitted a number of declarations to talk about their supposed knowledge that was clearly outside the witness's personal knowledge. Our objections went to their statement of genuine issues and linked it to whatever testimony that they submitted therein. So it goes beyond just the Zumwalt declaration that was beyond his personal knowledge. And, for example, the other example is that the Uribe testimony that they rely upon heavily to bolster this workbook. That was part of his declaration was stricken. And I noted in one of the footnotes in my brief that he submitted a declaration that contradicted the amount of training he had that he swore to in depositions. So my point is the record here has the court is going to make up its own mind on the record that we submitted. And I stand behind what we said about the record and how we characterize errors. The most important point for me to make here is that the workbook itself is an Excel spreadsheet with math and multiplication formulas. They use the term formula to make it sound like a trade secret when all it is is adding up how many people are where. Why isn't that a factual dispute? Because, again, as a matter of law, you cannot say that this is unknown to persons skilled in the industry. Why couldn't there be a unique method to this? But the cases say that a unique method, a more efficient method, an efficient tool, a useful tool, those are not enough to derive independent economic value from being unknown to others. And when it is not... Didn't they submit an expert report saying that it was? I don't believe so. I'm sorry, declaration. There was a declaration that they said, yes. But, again, you cannot create a triable issue simply by submitting a self-serving declaration. And part of their evidence that they submitted in opposition was already stricken on that basis. So our point is that... Let me go back to inferences, okay? There's a suggestion... Well, but you don't want to do that because you draw all reasonable inferences in favor of the non-moving party. Correct, but it has to be based on something that's reasonable. And my point is that this court, federal courts, have all talked about how inferences given to the non-moving party in many contexts has to be reasonable and plausible. I mean, even in the motion to dismiss context, which is the most liberal in terms of crediting the opposing side, Iqbal tells us that the inference has to be plausible, right? And so in all of these cases, the inference has to be reasonable. And they don't have evidence to connect these supposed changes to metadata to my clients. There's no such thing as an inquiry notice. We have to know. You can't ignore the efforts that my client made to stop any theft as being some conspiracy, which is what they did. And the district court recognized that. Mr. Evans, I know you have about a minute or so left. Why don't you address the last point, which is what the district court ruled on, which was knowledge, ratification. They have no knowledge. They have no evidence of ratification or knowledge. They have no knowledge. I'm sorry. They have no evidence that my clients knew when they were using these that they were actually CSE originating. Because, again, this is an Excel spreadsheet that has no uniqueness to it. It's just a bunch of sheets adding different things and then summarizing them in the top sheet. That's it. And so when they say that ratification comes from use, they still have to prove that there was knowledge that it was taken. And, by the way, even if you say, well, okay, Landmark ratified the use of an Excel spreadsheet, the Excel spreadsheet still has to be a trade secret in the first instance. You don't get to liability as a matter of law or possible liability as a matter of law without there being a trade secret. And, again, the self-directed case, these other cases, all say that just because it's a useful tool doesn't make it a trade secret. For the library, just one other point on the library. This is not a compilation in the manner that these other cases that talk about compilations suggest. Those cases aggregate millions of bits of data through the use of some software or programming. That's the trade secret. These are documents. They're readily identifiable. It's an 847-page stack, 67-page stack. And none of those are trade secrets because if you look at each one of those documents, they include things like hurricane relief efforts from Katrina, footwear choices, sexual harassment training. These are not trade secrets under any sense. Again, we urge this court to affirm and end this odyssey for my clients. Thank you. Thank you, Mr. Venzato. I can see we had a minute left. Very brief, Your Honor. The workbook was not just an Excel spreadsheet. I would direct the court to the Brock and Uribe declarations. It was a very complex tool. Our expert, Goodman, also explained that and said it would take significant time and effort to create. That's borne out by CSC's own experience. It took years. But most tellingly, if it was so easy, why didn't others have it? Why didn't Landmark have it? There was evidence in this record that Landmark tried to create their own workbook. Evidently, they didn't succeed because the evidence showed they continued to use the one that Mr. Haskell had stolen from CSC. And with that, I'll submit the case. Okay. Thank you, counsel. Thank you very much, counsel. The matter is submitted at this time.
judges: Pregerson, Noonan, Paez